**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

ROSALIE CROWE,
                                        Plaintiff,
        v.                                                      No. 09-CV-928
                                                                  (FJS/DRH)
MICHAEL ASTRUE, Commissioner of
Social Security,
                                        Defendant.

_____

**APPEARANCES:**                          **OF COUNSEL:**

LACHMAN & GORDON                    PETER A. GORTON, ESQ.
Attorney for Plaintiff
Post Office Box 89
1500 East Main Street
Endicott, New York 13761-5434

HON. RICHARD S. HARTUNIAN          KAREN T. CALLAHAN, ESQ.
United States Attorney for the          Special Assistant United States Attorney
    Northern District of New York
Attorney for Defendant
Room 218
James T. Foley U.S. Courthouse
Albany, New York 12207

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER[1]**

        Plaintiff Rosalie Crowe ("Crowe") brings this action pursuant to 42 U.S.C. §

405(g) seeking review of a decision by the Commissioner of Social Security

("Commissioner") denying her application for benefits under the Social Security Act.

Crowe moves for a finding of disability and the Commissioner cross-moves for a

_____

        [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

judgment on the pleadings.  Dkt. Nos. 14, 17.  For the reasons which follow, it is recommended that the Commissioner's decision be affirmed.


## I. Procedural History

On February 24, 2006, Crowe filed an application for supplemental security income benefits pursuant to the Social Security Act, 42 U.S.C. § 401 et seq. claiming an alleged onset date of September 1, 2005.[2]  T. 13, 49-55, 56.  That application was denied on June 14, 2006.  T. 44-47.  Crowe requested a hearing before an administrative law judge ("ALJ") and a hearing was held on July 17, 2008.  T. 13, 251-78.  In a decision dated October 28, 2008, the ALJ held that Crowe was not entitled to disability benefits.  T. 10-19.  Crowe filed a timely request for review, and on June 10, 2009, the Appeals Council denied Crowe's request, thus making the ALJ's findings the final decision of the Commissioner.  T. 5-8.  This action followed.


## II. Contentions

Crowe contends that the ALJ erred in (1) failing to conclude that Crowe's additional physical impairments were severe; (2) finding that Crowe was not credible concerning her statements of disability; (3) concluding that Crowe retained sufficient residual functional capacity (RFC) to perform work; and (4) determining that Crowe retained the RFC to work without calling a vocational expert ("VE") to testify.

---

[2]"T." followed by a number refers to the page of the administrative record. Docket No. 7.

## III. Facts

Crowe is a 56 year old female.  T. 255.  Crowe graduated from high school and completed one full year of college.  T. 258.  Previous work experience includes home health aide, cleaning at a hotel, church sexton, and bookkeeper at a toy store.  T. 61, 66-72, 259-61.  Crowe alleges that she became disabled on September 1, 2005 due to post traumatic stress disorder (PTSD), anxiety, depression, Hepatitis C, arthritis, and bunions.  T. 49, 60.

## IV.  Standard of Review

### A. Disability Criteria

"Every individual who is under a disability shall be entitled to a disability. . . benefit. . . ."  42 U.S.C. § 423(a)(1) (2004).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  Id. § 423(d)(1)(A).  A medically determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience.  Id. § 423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques."  Id. § 423(d)(3).  Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational

3

background, age, and work experience."  Ventura v. Barnhart, No. 04-CV-9018(NRB),

2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d

1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based upon 20 C.F.R. §

404.1520 & 416.920, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity.  If he [or she] is not, the
> [Commissioner] next considers whether the claimant has a 'severe
> impairment' which significantly limits his [or her] physical or mental ability
> to do basic work activities.  If the claimant suffers such an impairment, the
> third inquiry is whether, based solely on medical evidence, the claimant
> has an impairment which is listed in Appendix 1 of the regulations.  If the
> claimant has such an impairment, the [Commissioner] will consider him [or
> her] disabled without considering vocational factors such as age,
> education, and work experience; the [Commissioner] presumes that a
> claimant who is afflicted with a 'listed' impairment is unable to perform
> substantial gainful activity.  Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's severe
> impairment, he [or she] has the residual functional capacity to perform his
> [or her] past work.  Finally, if the claimant is unable to perform his [or her]
> past work, the [Commissioner] then determines whether there is other
> work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  The plaintiff bears the initial

burden of proof to establish each of the first four steps.  DeChirico v. Callahan, 134

F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry

progresses to the fifth step, the burden shifts to the Commissioner to prove that the

plaintiff is still able to engage in gainful employment somewhere.  Id. at 1180 (citing

Berry, 675 F.2d at 467).


**B. Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine

4

whether the correct legal standards were applied and whether substantial evidence supports the decision.  Berry, 675 F.2d at 467.  Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision."  Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  If the Commissioner's finding is supported by substantial evidence, it is conclusive.  42 USC § 405(g) (2006); Halloran, 362 F.3d at 31.

## V.  Discussion

### A. Medical Evidence

#### 1. Work History

Crowe has not engaged in any substantial gainful activity since February 7, 2006.  T. 15.

## 2. Medical Treatment Records

In August 2004, Crowe was involved in a motor vehicle accident from which she complained of pain in her neck, back, and ribs.  T. 111-14.  The x-rays showed no fractures and she was given pain medication for her discomfort.  T. 112-13, 115, 117.  Upon examination Crowe's gait was steady and her blood pressure was documented at 160/90.  T. 111, 114.

On January 30, 2006, Crowe began treatment with the Ithaca Free Clinic.  T. 123-24.  She reported that she was experiencing difficulties with her vision, arthritis, depression, substance abuse issues, and bunions on both of her feet.  T. 124.  At that time, her blood pressure was 138/84 in one arm and 132/80 in the other.  T. 120, 214.  Crowe reported drinking a twelve-pack of beer each day, suffering from various symptoms from menopause, and having food and environmental sensitivities.  T. 121, 215.  The Clinic recommended acupuncture.  T. 121, 215.  On February 13, 2006, Crowe returned to the Clinic complaining of muscle aches and pain in her feet from her bunions.  T. 118, 212.  Her blood pressure was 130/84.  Id.  Subjectively she reported feeling more like herself after the acupuncture therapy and objectively  improvement was noted.  T. 119, 122, 213.  On February 26, 2006, Crowe underwent a routine breast screening and gynecological examination where she also reported right side pain which had manifested a week prior yet was successfully relieved with pain medication.  T. 182-88.

In April 2006, Crowe was seen by Dr. James Naughten for an internal medical examination.  T. 126-30.  Crowe's subjective medical history included suffering from Hepatitis C since 2001 which had recently caused her eyes to yellow and produced

6

pain in her abdomen.[3]  T. 126.  Also, Crowe had anxiety, bilateral shoulder and back

pain, and bilateral bunions which had plagued her for twenty years.  Id.  Crowe's pain

was sharp, though she did not have surgery.  Id.  X-rays revealed that when her

shoulder pain began in 2005, after a fall, she had fractures in both shoulders.  Id.

Crowe also has suffered from hypertension since 2001, though her cardiac status was

stable, and she was in recovery from substance abuse.  T. 126-27.  Crowe's daily

activities included cooking, showering, cleaning once a week, shopping twice a week,

watching television, listening to the radio, reading, and going to church.  T. 127.

Upon examination, consultative examiner Dr. Naughten recorded Crowe's blood

pressure to be 120/76 and her gait to be normal and she appeared in no apparent

distress.  T. 127.  Crowe could squat in a normal stance, required no assistive devices,

and did not need assistance climbing on or off the table or rising from her chair.  T. 127.

Her cervical and lumbar spine showed full range of motion, though there was bilateral

lumbar pain, spasm, and tenderness on palpation.  T. 128.  Crowe also had full range

of motion in her shoulders, forearms, elbows, wrists, hips, knees, and ankles and no

evident muscle atrophy.  Id.  Dr. Naughten also noted two very prominent bunions on

both of her feet.  Id.  The doctor found "[n]o evidence of impaired judgment or

significant memory impairment."  T. 129.  Dr. Naughten diagnosed her with lower back

pain, hypertension, Hepatitis C, substance abuse, bunions, and bilateral shoulder pain.

T. 129.  Her prognosis was "stable currently, [though it] may progress to guarded in the

---

[3] In an undated medical record, blood test results indicate that Crowe was
positive for the Hepatitis C antibody.  T. 193.  It also appears that Crowe's Hepatitis B
surface antibody response was inadequate and immediate re-vaccination was
recommended.  Id.

future." Id.  Crowe also had no limitations seeing, hearing, talking, sitting, standing, pushing, pulling or reaching; mild limitations with walking; mild to moderate limitations climbing the stairs; and moderate limitations lifting and carrying objects.  T. 129.  On April 21, 2006, Crowe also received radiology results for her lower back.  T. 131. Testing showed that the "disc space at L4-5 [was] . . . narrowed. [However, n]o spondylolisthesis or spondylolysis [wa]s present."  T. 131.

On May 5, 2006, Crowe underwent a psychiatric evaluation with Dr. Ransom.  T. 133-37.  Crowe's subjective history included college for a few years but no employment. T. 133.  While Crowe suffered from depression and PTSD from previous abusive relationships, she reported no prior hospitalization or outpatient treatment, though she had been treated for depression the last three weeks.  T. 133.  Crowe also reported that "[s]he has frequent intrusive thoughts regarding [her abuse] . . . sleeps fitfully . . . has no appetite . . . hears dead people talking to her for the last two to three years . . . often hears voices when she is alone . . . has frequent crying spells, irritability, low energy, racing thoughts . . . [and] cannot relax [or] . . . get anything done."  T. 133.

Crowe denied general feelings of anxiety, panic attacks, manic symptoms or thought disorders.  T. 133.  During the evaluation Crowe was cooperative and appropriate, her gait and posture were normal, and she "expressed [a] mild[] to moderate[] dysphoric affect during the evaluation."  T. 134.  Crowe was of average intelligence and it was noted that she could "dress, bathe and groom herself, cook and prepare food, do cleaning, laundry and shopping . . . manage money . . . ha[ve] a license, but no car . . . socializ[e] with neighbors and friends at a church group," and watch TV.  T. 135.  In sum, Dr. Ransom determined that Crowe

8

> can follow and understand simple directions and
> instructions, perform simple tasks independently, maintain
> attention and concentration for tasks, maintain a regular
> schedule and learn simple tasks.  She will have mild to
> moderate difficulty performing complex tasks independently,
> relating adequately with others and appropriately dealing
> with stress due to psychotic depression, currently dealing
> with stress due to psychotic depression, currently moderate,
> as well as post-traumatic stress disorder, currently
> moderate.

T. 136.  Dr. Ransom recommended "[c]ontinu[ing] current treatment with further

medication management[, as Crowe's p]rognosis is fair to good with continued

treatment."  T. 136.

On June 6, 2006, Crowe underwent a physical RFC assessment with a disability

analyst.  T. 146-51.  The analyst determined that Crowe could (1) occasionally lift and

carry twenty pounds; (2) frequently lift and carry ten pounds; (3) stand and/or walk for

about six hours in an eight-hour workday; and (4) sit with normal breaks for about six

hours in a workday.  T. 147.  Moreover, Crowe had unlimited abilities to push and pull

things.  T. 147.  At that time, Crowe's blood pressure was 120/76 and she was not on

medication to control it, she appeared in no distress, her gait was normal, she needed

no assistance changing for the exam, climbing on and off the exam table, or rising from

her chair, and she had full range of motion in her cervical and lumbar spine.  T. 147.

However, Crowe was experiencing pain and spasms in her lower back and tenderness

on palpation.  T. 148.  The analyst determined that Crowe had no postural,

manipulative, or visual limitations with her physical RFC.  T. 148-49.  Additionally,

Crowe experienced no communicative or environmental limitations.  T. 149.  The

analyst concluded that Crowe's "allegations [were] partially credible but d[id] not

9

preclude work." T. 150. Conclusions included mild limitations walking and climbing stairs but no limitations for pushing, pulling, reaching, sitting or standing and Crowe was not disabled. T. 150.

On June 8, 2006, Crowe underwent a mental RFC with Dr. Apacible. T. 152-55. Dr. Apacible concluded that Crowe was not significantly limited in her ability to (1) remember locations, procedures, or understand and remember short and simple instructions; (2) maintain socially appropriate behavior; (3) stay clean; (4) be aware of normal workplace hazards and take appropriate precautions; or (5) travel in an unfamiliar place or use public transportation. T. 152-53. Dr. Apacible also determined that Crowe was moderately limited in her ability to (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) perform activities within a schedule and maintain punctuality; (4) work in coordination with and in proximity to others; (5) complete a normal work day or week without interruptions from psychologically based problems; (6) interact appropriately and answer simple questions or request assistance from or for the general public; (7) accept instructions and respond appropriately to criticism; (8) get along without distracting her peers and coworkers; (9) respond appropriately to changes in work; or (10) set realistic goals and make independent plans. T. 152-53. Crowe was cooperative and appropriate with normal gait, posture and behavior and a mildly to moderately dysphoric affect. T. 154. The conclusion was that Crowe "would be able to perform simple work independently. She may have difficulty dealing with stress and adequately dealing with others . . . [but she] is not credible . . . [and] . . . she [c]ould be able to perform simple work at a job where she does not have [to] work closely with other people." T. 154.

10

That same day, Dr. Apacible also completed a psychiatric review of Crowe.  T. 156-69.  Dr. Apacible determined that Crowe had medically determinable impairments with regard to her affective disorder (§ 12.04), anxiety disorder (§ 12.06), and substance abuse (§ 12.09), but that none of these conditions precisely satisfied the diagnostic criteria sufficient to indicate a disability per se.  T. 159-64, 167.  Dr. Apacible also concluded that Crowe had (1) no limitations with her activities of daily living; (2) mild limitations with her ability to maintain proper social functioning; and (3) moderate limitations with her ability to maintain concentration, persistence and pace.  T. 166.

In August 2006, Crowe returned to the Ithaca Free Clinic after having a motor vehicle accident complaining of soreness over her whole body but admitted to an inability to buy pain medication.  T. 204.  Crowe had bruising on her leg and bumps on her head and she was encouraged to use heat and ice.  T. 204.  The following week, Crowe returned to the clinic reporting depression over the recent accident as well as the fact that she believed her diagnosis of either Hepatitis B or C to be the reason why she was unemployable.  T. 204.  Crowe reported seeing Dr. West for her Hepatitis five years ago, and expressed interest in returning to him once she obtained insurance coverage through Medicaid.  T. 204.  Her blood pressure that day was  139/100 in her right arm and 154/99 in her left.  T. 220.

Crowe sought treatment for anxiety and panic attacks again, in September, at the Ithaca Free Clinic.  T. 218-19.  Crowe complained of depression and mood swings and reported that she had been on medication for these problems in the past, though not recently.  T. 219.  Additionally, she stated that although enrolled in a substance abuse program, she had not been attending.  T. 219.  Crowe was diagnosed with both

11

depression and substance abuse problems, was given samples for medication, and referred to a mental health clinic.  T. 219.

On October 26, 2006, Crowe returned to the Ithaca Free Clinic where her blood pressure was 174/107.  T. 216.  Crowe reported that she was currently receiving mental health treatment, but felt incapable of working because she suffered from panic attacks when she left her house.  T. 217.  She also stated that she had arthritis, bunions, and a history of hypertension.  T. 217.  The Clinic recommended that she begin taking medication once she received Medicaid and that she cease drinking and smoking.  T. 217.  Crowe was also written a letter, by Dr. Linda Andrei, on that same day stating that she had multiple medical problems, including Hepatitis, hypertension and mental health issues, and that consequently Crowe felt that she was unable to work because of these ailments.  T. 234.  A few days later, Crowe returned to the clinic where her blood pressure had decreased to 159/94.  T. 205.  It was noted that Crowe was seeing Dr. West for a follow-up appointment concerning her Hepatitis and that she was reporting complaints of bilateral pain and tension in her shoulders.  T. 205.

Between October and December, 2006, Crowe returned to the Ithaca Free Clinic complaining about experiencing a bad reaction to her anti-hypertension medication.  T. 210.  Treating sources indicated concern for her liver and the various tonics which Crowe was consuming.  T. 210.  On December 4, 2006, Crowe stopped taking her medications and her blood pressure values in each arm were 158/99 and 165/101 respectively.  T. 201.  The Clinic intended to continue adjusting the type and dose of blood pressure medication Crowe was receiving to mitigate the side effects while controlling her hypertension.  T. 201.  Crowe returned for another blood pressure check

on December 28, 2006, stating that she was feeling well and scheduled to see Dr. West regarding her Hepatitis.  T. 201.  Crowe's blood pressure had again dropped to 145/95 and 130/90 and it was recommended that she continue her on her present medications and doseages.  T. 201.

On January 10, 2007, Crowe went to Arnot Medical Center and was treated by Dr. Erica Sniderthammavong.  T. 230-33.  Dr. Sniderthammavong noted that Crowe's blood pressure was 126/78 and that she was primarily complaining of bilateral pain in her feet which had continued for the past decade.  T. 230.  Crowe had last been seen by Dr. Sniderthammavong in 2003, and she wished to re-establish the treating relationship.  T. 231.  Since her last visit, Crowe had been diagnosed and medicated for her hypertension, though she reported side effects including fatigue, difficulty recalling dreams, palpitations, and decreased clarity when thinking.  T. 231.  Crowe had also been diagnosed with mental ailments including bipolar disorder and PTSD, as well as arthritis in her neck and back and a history of Hepatitis.  T. 231

Crowe reported that after she was diagnosed with hypertension she began drinking, but that she had recently been abstaining from all alcohol and going to the gym.  T. 231-32.  She denied any weakness or muscle aches but complain of bilateral foot pain.  T. 232.  Crowe also reported hearing voices occasionally in the past, or seeing things that were not there, though she denied being diagnosed with schizophrenia or having suicidal ideations.  T. 232.  Dr. Sniderthammavong also observed the bunions and calluses on Crowe's feet.  T. 232.  Crowe was instructed to continue on her hypertension medication, see a psychiatrist, attend her referral with Dr. West, consult the services of a podiatrist, and abstain from drugs and alcohol. T. 233.

13

On February 22, 2007, Crowe received a letter from Dr. Sniderthammavong stating that her cholesterol was too high, sending her information on different meal plans, and advising her to attempt to control her cholesterol with her diet as the medication required might complicate her prior diagnosis of Hepatitis.  T. 235.

On February 23, 2007, Crowe saw Dr. James Roush from Chemung County.  T. 172-78.  Crowe complained of painful bunions, which were noted to be prominent.  T. 172.  Crowe also stated that she experienced numbness in her toes while standing, walking, sitting, and lying down and had a history of Hepatitis, substance abuse, and hypertension.  T. 172-73.  Dr. Roush noticed both bunions and callouses which Crowe had reportedly had for thirty years.  T. 173.  Dr. Roush recommended an ointment for Crowe's feet and stated that she should probably stay away from the oral medication as it might cause a problem with her liver.  T. 174.  Dr. Roush also recommended that Crowe go to another physician more experienced with bunions to have them surgically removed.  T. 174.  Dr. Roush also counseled Crowe on more appropriate footwear for her bunions and recommended she try softening them with various household items.  T. 174.  Dr. Roush also called Crowe's primary care physician to report that he recommended she see another physician about bunion surgery and to point out various discrepancies between Crowe's subjectively reported medical history and that reflected in her chart.  T. 176-77.

On April 24, 2007, Crowe returned to the Ithaca Free Clinic for her blood pressure check which measured 152/96.  T. 201.  She returned on April 30, whereupon it was noted that her blood pressure was high, her medication was a problem, and Dr. Ginsburg wrote a letter on Crowe's behalf stating that "Crowe has been compliant with

her medication regime and . . . [i]t would also be in Ms. Crowe's best interests for her Medicaid to continue."  T. 203.  On November 29, 2007, Crowe consulted with an herbalist at the Ithaca Free Clinic who noted that Crowe had been trying to help herself lower her blood pressure by taking medication, exercising, and changing her diet.  T. 196.  Crowe was provided with tinctures for treatment.  T. 196.  On December 10, 2007, Crowe again returned to the Clinic for her blood pressure which was noted at 184/106 and Crowe was given a prescription for medication which she could not afford to purchase.  T. 180.

On March 24, 2008, Crowe's blood pressure was again taken by the Ithaca Free Clinic and noted to be 175/111.  T. 179.  Crowe was again counseled on the ways in which she could reduce her blood pressure through diet and exercise.  T. 179.  On April 28, 2008, Crowe returned to the Clinic again reporting that she had fully abstained from using alcohol for two months, had an occasional cigarette, and suffered from night sweats, though those were attributed to menopause.  T. 179.  Crowe received a blood pressure treatment and the results were that her blood pressure remained the same before and after the treatment, at 143/90.  T. 179.

The following day Crowe was evaluated by a physician's assistant, Janet Matthews for her physical at Arnot Medical Services.  T. 226-29.  Crowe's blood pressure was 164/110, though she was not unsteady on her feet.  T. 226.  Crowe reported taking herself off all her medications and attempting to manage her blood pressure through diet and exercise because she was experiencing side effects from her medication.  T. 226.  Crowe also complained of multi-joint pain and achiness and noted her mental health problems.  T. 226.  Crowe was also discontinued from Medicaid,

15

suffering from financial problems, and was unable to pay for her medication.  T. 226.

Her Medicaid eligibility was later resumed.  T. 226.  Crowe complained of throbbing

pain in her feet.  T. 226.  Crowe had not gone to her psychiatrist in over a month and

Matthews noted that relationship needed to be reestablished.  T. 226.  Matthews

recommended that Crowe see a psychiatrist to address her bipolar disorder and a

podiatrist to treat her bunions.  T. 228.  Additionally, Crowe required medication to get

her blood pressure back under control.  T. 228.

On May 27, 2008, Crowe returned to see Matthews and her blood pressure had

dropped to 152/96.  T. 223.  Crowe had no complaints of pain but thought that she was

allergic to her blood pressure medication had instead reduced her salt intake and had

been exercising more at her fitness club.  T. 223.  Crowe had also recently taken her

own blood pressure and her own test reported a reading of 130/70.  T. 223.  Crowe had

failed to follow up with her psychiatrist since the last appointment.  T. 223.  Dr.

Matthew's assessment was that Crowe was in no acute distress and that she needed to

continue with her healthy diet and exercise, as well as with taking her medication on a

consistent basis, and also needed to follow up with her psychiatrist.  T. 224.

On July 7, 2008, Dr. Ginsburg from the Ithaca Free Clinic completed a

questionnaire related to Crowe's health.  T. 239-43.  Dr. Ginsburg noted that Crowe's

diagnoses included hypertension, arthritis in her back, knees and elbows, and panic

attacks.  T. 239.  Crowe was required to have more than one ten minute rest period per

hour, and each rest period required a substantial amount of time thus rendering Crowe,

in Dr. Ginsburg's opinion, unable of completing a forty hour work week.  T. 239.  Crowe

also suffered from moderate pain and fatigue.  T. 239-40.  While Crowe's ability to sit

was not affected by her condition, her ability to stand and walk was affected, resulting in

Crowe being able to stand with the assistance of a cane for at least one hour in a

normal work day.  T. 240.  Lastly, Crowe could lift less than ten pounds for up to three

hours a day, but should never lift more than ten pounds.  T. 241.  Crowe had poor

concentration skills and a mild ability to sustain a work pace as she had been taking

multiple medications for the past two years and had suffered side effects, including

dizziness.  T. 241.

Crowe's mental abilities included a (1) moderate inability to maintain

concentration for extended periods of time; (2) moderate inability to accept instructions

and respond appropriately to criticism from supervisors as well as work with co-workers

or peers without distracting them; (3) marked inability to perform activities within a

regular schedule and be punctual; (4) marked inability to sustain an ordinary routine

without supervision and complete a normal work day or week without interruptions from

her psychological symptoms; and (5) marked inability to interact appropriately with the

general public and respond appropriately with changes in the work setting.  T. 243.

Lastly, due to Crowe's mental condition, employers could expect her to miss more than

three, four-hour periods of time, of work, per month.  T. 243.

On November 24, 2008, Dr. Ginsburg also completed a medical screening and

employability assessment noting that Crow suffered from hypertension and an infected

foot.  T. 247.  Dr. Ginsburg indicated that Crowe was on medication for her blood

pressure and foot and was moderately limited in her ability to walk, stand, and use

stairs.  T. 247.  No other limitations with her ability to sit, lift, carry, push, pull,

communicate, understand, carry out instructions, maintain attention, or make simple

decisions was noted.  T. 247.  Dr. Ginsburg concluded, however, that because Crowe's blood pressure was "too high [there should be n]o work now."  T. 248.

### 3. Crowe's Testimony

On July 17, 2008, Crowe testified before the ALJ.  T. 251-78.  Crowe related that she was born on July 15, 1954, and that she had attended college for two years though she never graduated or received any special vocational training.  T. 255-58.  Crowe's previous employment included being a cleaning woman, book keeper, and church sexton, though she had not held any employment since the temporary employment agency that secured her last job closed down.  T. 259-61.

Crowe claimed disabling pain in her feet, lower back, shoulders, neck and hands. T. 261-62.  She also claimed disability based upon her depression and mental health ailments as well as her hypertension and fatigue (secondary to Hepatitis).  T. 261-62. When Crowe experienceed a panic attack, she was unable to breathe and tried to  go where she could be alone.  T. 272.  She also suffered side effects from the medication which included headaches, fatigue, and poor concentration.  T. 263-64, 273-74.

Crowe's daily activities included going to bed, waking up in the middle of the night to listen to a radio program, going back to bed, watching television or listening to the radio, taking care of her cat and dog, cooking meals, attending to her personal hygiene, resting by the garden, reading in the shade, tending to her garden, and attending meetings.  T. 264-67.  Crowe went into town about twice a month to go shopping and sometimes walked her dog during the day.  T. 265.  Crowe hitch-hiked or used public transportation to travel as she let her driver's license expire due to the panic

18

attacks she experienced.  T. 257.  While  moving around, Crowe was required to stop every ten to fifteen minutes to rest.  T. 263, 269.  Crowe claimed that due to her depression and panic, if not lying down, she often felt unsafe.  T. 272.  Crowe reclined every four hours for approximately two hours at a time.  T. 273.  Crowe also testified that completing her daily activities, such as tending the garden or preparing her meals, took much longer than in the past and left her exhausted when done.  T. 274.  Crowe also required frequent mental breaks to refocus, occurring about every fifteen minutes for thirty minutes at a time.  T. 275.  Also, she reported that the pain associated with her arthritis became so acute that it sometimes reduced her to tears.  T. 275.  Due to Crowe's financial situation, she was been unable to receive regular treatment for her bunions or purchase medication which was prescribed for her at the Ithaca Free Clinic, until she recently was re-enrolled in Medicaid.  T. 276-77.

## B. Severity

Crowe contends that the ALJ failed to assess properly the severity of her conditions both individually and in conjunction with one another.  The Commissioner contends that the ALJ properly evaluated the severity of Crowe's impairments.  The ALJ found that Crowe suffered from severe impairments due to her depression and PTSD. T. 15.  However, her other physical disorders, including her Hepatitis, bunions, and hypertension, did "not impose significant limitations on [Crowe's] functioning."  T. 15.

As discussed above, step two of the sequential evaluation process requires a determination whether the claimant has a severe impairment which significantly limits the physical or mental ability to do basic work activities.  See subsection IV(A) supra; 20

19

C.F.R. § 404.1521(a) (2003).  Where a claimant alleges multiple impairments, the court

will consider "the combined effect of all [] impairments without regard to whether any

such impairment, if considered separately, would be of sufficient severity."  Id. §

404.1523.  An impairment, or combination thereof, is not severe if it does not impinge

on one's "abilities and aptitudes necessary to do most jobs."  Id. § 404.1521.  Basic

work activities which are relevant for evaluating the severity of a physical impairment

include "physical functions such as walking, standing, sitting, lifting, pushing, pulling,

reaching, carrying, or handling. . . ."  Id. § 404.1521(b)(1).

 "The Social Security regulations list certain impairments, any of which is

sufficient, at step three, to create an irrebuttable presumption of disability."  DeChirico,

134 F.3d at 1180; see also 20 C.F.R. § 404.1520(d) (2003); Id. at pt. 404, subpt. P.

App. 1 (2003)(listing of per se disabling ailments).  Additionally, the regulations state

that "if an individual has an impairment that is 'equal to' a listed impairment," that

individual is disabled regardless of his or her age, education, or work experience.

DeChirico, 134 F.3d at 1180 (quoting 20 C.F.R. § 404.1520(d) (2003)).

Crowe contends that her Hepatitis, hypertension/high blood pressure, bunions,

and back problems were all individually severe.


**1. Hepatitis**

"The burden is upon [Crowe] to show that [s]he suffers from a severe impairment

that renders h[er] disabled."  Ferraris v. Heckler, 728 F.2d 582, 584 (2d Cir. 1984)

(citations omitted).  With respect to Crowe's claims of disabling Hepatitis, Crowe has

failed in her burden as the record is devoid of information necessary to establish

severity.  <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 n.5 (1987).  The record reflects that

Crowe sought treatment for Hepatitis and had testing done which confirmed the

presence of Hepatitis antibodies.  However, there is no date for the testing and there

are no additional medical records explaining her diagnosis, its severity, or its

recommended treatment.  These discrepancies and gaps in the information were noted

in her medical record by Drs. Roush and Sniderthammavong, along with

recommendations to return to Dr. West for whatever treatment was necessary.  T. 174,

177, 193, 201, 233.  Thus, there is nothing in the record which established from which

type of Hepatitis Crowe was suffering, how it limited Crowe's daily activities, or whether

it was expected to resolve with medication.  Moreover, Crowe's own testimony indicates

that she was still able to participate in most of her activities of daily living, which

contradicts conclusory claims that the Hepatitis, alone or in combination, represented a

severe condition.


## 2. Hypertension and High Blood Pressure

Crowe also asserts that her hypertension and high blood pressure constituted

severe conditions.  Crowe's blood pressure readings fluctuated over a four year period,

spiking in the Fall and Winter of 2006 when Crowe stated she was no longer taking her

prescribed medication, leveling back out for the next few months when Crowe re-started

taking her medication, and rising again when Crowe complained of side effects and

took herself off her medication.  Crowe also subjectively reported improvement with her

blood pressure when she went through period where she controlled her blood pressure

with an emphasis on her diet and exercise habits.  This cycle ended in November 2008

when Dr. Ginsburg concluded that Crowe's blood pressure was too high and she should not work.  T. 248.  "Impairments that are controllable or amenable to treatment do not support a finding of disability."  Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009) (citations omitted); see also 20 CFR § 416.930 (explaining that, except in limited circumstances, claimants need to follow medical treatment in order to receive benefits).  "The same is true even where the symptoms may sometimes worsen, requiring adjustments in medication, as long as the impairment is generally controllable."  Patterson v. Astrue, No. 10-CV-148, 2011 WL 1885714, at *11 (D. Neb. May 18, 2011) (citations omitted).  "However, an ALJ should consider whether the claimant's failure to take medication or seek treatment is the result of a medically determinable symptom . . . rather than merely willful, justifiable, or unjustifiable noncompliance."  Id. (citations omitted).

In this case, it is clear that various medical professionals prescribed medication to control Crowe's high blood pressure.  This medication was successful in regulating her blood pressure as demonstrated by her blood pressure readings in early 2006, early 2007, and seen by the provision of treatment on April 28, 2008.  Crowe cannot be disabled if her condition is treatable.  There is nothing in the record to indicate that any of Crowe's severe mental impairments interfered with her ability to take her medication.  Instead, the record shows that Crowe's major impediment to receiving her prescriptions was financial, and that when she had been disenrolled from Medicaid she was unable to purchase what she needed.  Crowe was encouraged by her providers to re-enroll in Medicaid, and has successfully completed that process according to her testimony.  T. 276-77.  To the extent that she was experiencing side effects from the various

22

medication she was receiving, such side effects can be managed by modifying the type of drug she is receiving and its doseage.  Thus the record also does not support Crowe's assertions that her blood pressure and hypertension were severe or a disabling per se.

### 3.  Bunions

Crowe claims that her bunions were also a severe medical condition.  Crowe complained that she suffered from foot pain secondary to her bunions and callouses for between one to three decades.  T. 126, 173, 230.  This included the time which she had been employed in various capacities, and this pain did not prohibit her from working in those circumstances.  T. 61 (showing employment history from 1994 through 2000).  Additionally, the record fails to indicate that this condition worsened or her health deteriorated over time.  Accordingly, the bunions may not now be classified as disabling.  See Snell v. Apfel, 177 F.3d 128, 135-36 (2d Cir. 1999) (holding that a condition which existed prior to the alleged onset date and did not prohibit the claimant from working or deteriorate from the time claimant was working, cannot later serve as the basis for disability).

Moreover, the medical professional that examined Crowe's feet provided her with home remedies to soften her callouses and bunions and recommended that she follow-up with another podiatrist to receive surgery.  Crowe explained that the treatment for her feet was inconsistent at best because she was unable to receive treatment since she could not afford it.  T. 276-77.  For the reasons discussed above, Crowe's receipt of Medicaid should also solve her treatment issues with her feet.

**4. Lower Back Pain**

Crowe also contends that her lower back pain should suffice to establish a severe impairment.  Crowe's medical records indicate that a diagnostic test found narrowing in her back and pain on palpation, but Crowe consistently retained full range of motion in her back and was able to dress and undress, climb on and off the examination table, and stand and squat into a chair without assistance.  Moreover, Crowe also subjectively reported being able to cook, clean, attend to her personal needs, walk her dog, care for her dog and cats, and garden.  This was also objectively noted in her physical RFCs which determined that her own limitations were mild and restricted to walking and climbing stairs.  T. 150.  Furthermore, it appears that pain medication, massage and acupuncture alleviated most, if not all, of Crowe's symptoms as complaints of pain or requests for pain medication were not consistent throughout her medical record.  Thus, it does not appear that the record supports a finding that Crowe's back pain impinged upon her physical functions.

Therefore, the Commissioner's findings as to the severity of Crow's conditions, both individually and in combination, were supported by substantial evidence and should be affirmed.

**C.  Subjective Complaints of Pain**

The ALJ determines whether an ailment is an impairment based on a two-part test.  First, the ALJ must decide, based upon objective medical evidence, whether "there [are] medical signs and laboratory findings which show . . . medical impairment(s)

24

which could reasonably be expected to produce [such] pain. . . ."  Barringer v. Comm'r

of Soc. Sec., 358 F. Supp. 2d 67, 81 (N.D.N.Y. 2005); 20 C.F.R. § 404.1529 (2003).

This primary evaluation includes subjective complaints of pain.  20 C.F.R. § 404.1529

(2003).  "'Second, if the medical evidence alone establishes the existence of such

impairments, then the ALJ need only evaluate the intensity, persistence, and limiting

effects of a claimant's symptoms to determine the extent to which it limits the claimant's

capacity to work.'"  Barringer, 358 F. Supp. 2d at 81 (quoting Crouch v. Comm'r of Soc.

Sec. Admin., No. 6:01-CV-0899 (LEK/GJD), 2003 WL 22145644, at *10 (N.D.N.Y. Sept.

11, 2003).

      An ALJ must consider all symptoms, including pain, and the extent to which

these symptoms are consistent with the medical and other evidence.  20 C.F.R. §

404.1529 (2003).  The claimant's credibility and motivation, as well as the medical

evidence of impairment, are used to evaluate the true extent of the alleged pain and the

degree to which it hampers the applicant's ability to engage in substantial gainful

employment.  See Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1978).  The ALJ must

consider several factors pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3):

> (i)  [The claimant's] daily activities;
>
> (ii)  The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv)  The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;
>
> (v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other

25

symptoms;

(vi) Any measures [the claimant] use[s] or ha[s] used to
relieve . . . pain or other symptoms (e.g., lying flat on [his]
back, standing for 15 to 20 minutes every hour, sleeping on
a board, etc.); and

(vii) Other factors concerning [the claimant's] functional
limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2003).

Crowe claims that her credibility was inappropriately questioned because the ALJ
did not integrate the full record into his opinion, omitting evidence which was indicative
of disability, like Crowe's unabridged medical history according to Dr. Ransom, and
overstating that which was in evidence.  However, the ALJ did evaluate the evidence as
a whole.  The ALJ acknowledged Dr. Ransom's report and Crowe's reports of
"symptoms such as fitful sleep, loss of appetite, auditory hallucinations, crying spells,
lack of energy, and difficulty relaxing."  T. 15.  Thus, the ALJ considered these findings,
leading to the conclusion that Crowe's mental impairments were severe.  However, the
ALJ's conclusions that Crowe retained a reasonable activity level which militated
against a finding of disability was supported by substantial evidence in the record.
Crowe testified to the fact that she lived alone and independently, and successfully,
tended to her own personal needs as well as those of her home and animals.  Crowe
also enjoyed hobbies of gardening and reading.  Crowe could go into town a few times
a month to go shopping by either using public transportation or hitch hiking.
Furthermore, while not specifically cited by the ALJ but included in the reports which her
relied upon, the ALJ's suspicions about Crowe's credibility were echoed by other
various medical professionals who had independently examined and treated Crowe.  T.

150, 154.

Crowe also contends that the ALJ was incorrect to cite her withdrawal from medication as a factor vitiating against her credibility.  Crowe's medical records indicate that, at least a significant portion of the times she ceased her medication, she was also experiencing some financial problems and was unable to purchase the medication. However, this does not negate the Commissioner's observation nor does it represent the sole evidence upon which the ALJ relied.  Smith v. Astrue, 2011 WL 93842, at *3 (N.D.N.Y. Jan. 11, 2011) (upholding a magistrate judge's decision affirming the ALJ's credibility findings of claimant because "even assuming that a claimant's inability to afford prescribed medication is not, by itself, grounds for denying a claim based on a failure to take prescribed medications," additional reasons were cited with regards to the claimant's credibility assessment and findings).  Crowe's reported daily activities, as well as the consensus with which other physicians distrusted Crowe and similarly assessed her demonstrates that substantial evidence still remained upon which the ALJ rejected Crowe's credibility.

Accordingly, substantial evidence supports the Commissioner's assessment of Crow's subjective complaints of pain and those findings should be affirmed.

## C. RFC

Crowe contends that there exists insufficient evidence in the record to support the ALJ's findings regarding RFC.  Crowe contends that the ALJ should have given her treating physician, Dr. Ginsburg, more credit than the consulting physicians and state examiners.

27

RFC describes what a claimant is capable of doing despite his or her impairments considering all relevant evidence, which consists of physical limitations, symptoms, and other limitations beyond the symptoms.  <u>Martone v. Apfel</u>, 70 F. Supp. 2d 145,150 (N.D.N.Y. 1999); 20 C.F.R.  §§ 404.1545, 416.945.  "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient."  <u>Martone</u>, 70 F. Supp. 2d at 150.  RFC is then used to determine whether the claimant can perform his or her past relevant work in the national economy.  <u>New York v. Sullivan</u>, 906 F.2d 910, 913 (2d Cir. 1990); 20 C.F.R. §§ 404.1545, 416.960 (2003).  The Second Circuit has clarified that, in Step 5 of the Commissioner's analysis, once RFC has been determined "the Commissioner need only show that there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's [RFC]."  <u>Pourpre v. Astrue</u>, 566 F.3d 303, 306 (2d Cir. 2009).

Here, the ALJ found, based upon the medical records, consultative reports, and Crowe's testimony, that she was capable to perform a wide range of light work.  T. 17-18.  Crowe contends that the ALJ failed to incorporate the appropriate restrictions into Crowe's RFC, including her physician's assessment that due to her blood pressure, she should not be working at all.   Crowe first argues that the ALJ failed to incorporate all of Dr. Ransom's observations and conclusions into her RFC, an error as the ALJ relied upon this assessment.  However, the ALJ did discuss Dr. Ransom's observations, as discussed <u>infra</u>, as well as incorporated and agreed with the ultimate conclusion that "from the evidence in file . . . [Crowe] would be able to perform simple work at a job where she does not have [to] work closely with other people."  T. 154.  This conclusion

28

incorporated Dr. Ransom's earlier stated limitations, including the fact that Crowe was only moderately limited in her ability to understand, remember and carry out detailed instructions, perform activities within a schedule, work in coordination and interact appropriately with others, and complete a normal workday or week without interruptions from psychologically based problems.  T. 152-53.   These same assessments had been stated month earlier in Dr. Ransom's psychiatric evaluation of Crowe as well as her concomitant psychiatric review.  T. 133-37, 156-69.

This assessment is also not inconsistent with the letter authored by Crowe's physician, Dr. Linda Andrei.  T. 211, 234.  Unlike Crowe's interpretation of the meaning of the letter, further inspection shows that Dr. Andrei was only paraphrasing Crowe's feelings that she was unable to work due to her mental health problems.  T. 211 ("She [(Crowe)] feels she is unable to work because of her above mentioned problems.").  Dr. Andrei's notes do not indicate that she echoed Crowe's assessment.  Instead, Dr. Andrei felt Crowe required medication which she would begin once she received Medicaid, to cease drinking and smoking, and to start attending group therapy and receiving some support.  T. 217.

Records for the following two years indicate that Crowe was having difficulty obtaining medication and adjusting to the medication that she had previously received. Recommendations from Dr. Sniderthammavong and Matthews indicated that Crowe was not attending meetings with her psychiatrist and that she needed to reconnect with a mental health professional.  However, the notes do not indicate anything more severe than that.  In fact, the notes with Matthews state that Crow was "[i]n no acute distress," and was instructed to continue pursuing her new healthy lifestyle, which included a

29

monitored diet and going to the gym.  T. 223-24.  Accordingly, the record as a whole does not indicate Crowe required a more stringent RFC.

Crowe next contends that Dr. Ginsburg's assessment should have been given greater weight.  However, as the ALJ pointed out, Dr. Ginsburg's assessment is at odds with that of the consultative doctors and the medical entries as a whole, including those from the Ithaca Free Clinic where Dr. Ginsburg worked.  Dr. Ginsburg's mental assessments were far more restrictive than those provided by Dr. Ransom and the disability analyst, and were unsupported by the record as a whole.  Additionally, the physical assessments were also far more stringent, including that Crowe could only stand for an hour and would require an assistive device (T. 240), than those provided by Dr. Naughten and the disability analyst, as well as contrary to Dr. Ginsburg's ultimate medical screening assessment which indicated that Crowe was moderately limited in her ability to walk, stand and use chairs, but had no other physical limitations.  T. 247.

> It is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consults, since such consultants are deemed to be qualified experts in the field of social security disability. Such reliance is particularly appropriate where . . . the opinions of these . . . State agency medical consultants are supported by the weight of the evidence.

See Fiozzo v. Barnhart, 2011 WL 677297, at *8 (N.D.N.Y. Jan. 19, 2011).  Accordingly, the ALJ's decisions to adhere to the limitations outlined by Drs. Naughten and Ransom and the disability analyst, and to accord Dr. Ginsburg's assessment little weight, are both supported by substantial evidence.

Finally, Crowe contends that the ALJ erred in failing to include her non-exertional limitations, including her fatigue caused by her medications and Hepatitis, when

considering her RFC.  However, the medical record does not indicate many such side effects.  On December 4, 2006, Crowe ceased taking blood pressure medication because it made her feel groggy, but medical records indicate that her providers, the Ithaca Free Clinic, switched her medication and when she returned three weeks later her blood pressure had decreased and Crowe "fe[lt] well."  T. 201.  The next discussion about issues with Crowe's medication dealt with her financial situation and her inability to purchase medication and her need for Medicaid.  T. 180, 201, 203, 226.  Records do not indicate the side effects of medication again until May 27, 2008, when Crowe reportedly took medication for four days and felt that her face was swollen and her voice was shaking.  T. 223.  These side effects are different from any contentions of disabling fatigue.  The next discussion of fatigue came with Dr. Ginsburg's assessment which reported that Crowe required multiple breaks in the course of a workday and would not be able to complete a forty hour work week.  For the reasons discussed above, these assessments were given little weight.

Thus, the ALJ did not include an analysis about how fatigue would impact Crowe's RFC because it was not a condition which was indicated in the medical record. Beyond those two medical entries, the first of which was resolved with Crowe switching medication which successfully alleviated her blood pressure problems, the only other discussion of the fatigue came from Crowe's own testimony.  For the reasons discussed above, Crowe's "subjective complaints [we]re [deemed] not fully credible."  T. 18. Accordingly, the ALJ's decision should be affirmed as including discussions about exhaustion and fatigue would not be supported by substantial evidence in the record.

### D. Treating Physician Rule

Crowe contends that the ALJ failed properly to credit the opinions of her treating physician, Dr. Ginsburg.  When evaluating a claim seeking disability benefits, factors to be considered include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability, and pain related by the claimant.  Harris v. R.R. Ret. Bd., 948 F.2d 123, 126 (2d Cir. 1991).  Generally, more weight is given to a treating source.  Under the regulations, a treating source's opinion is entitled to controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2) (2005); Shaw, 221 F.3d at 134.  "This rule applies equally to retrospective opinions given by treating physicians."  Campbell v. Astrue, 596 F. Supp. 2d 445, 452 (D. Conn. 2009) (citations omitted).  Before a treating physician's opinion can be discounted, the ALJ must provide "good reasons."  Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998).

The ALJ is required to assess the following factors in determining how much weight to accord the physician's opinion: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors."  Schaal, 134 F.3d at 503.  If other evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or conclusive, and the less consistent the opinion is, the less weight it will be given.  Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999).  Ultimately, the final determination of disability and a claimant's inability to work rests

32

with the Commissioner.  Id. at 133-34; see 20 C.F.R. § 404.1527(e) (2005).

As previously discussed, Dr. Ginsburg's physical and mental analysis and ultimate conclusions that Crowe was too disabled to work were not supported by substantial evidence in the record.  In actuality, they were completely contrary to the treatment records from the Ithaca Free Clinic as a whole, and a subsequent physical work assessment statement supplied by Dr. Ginsburg.  For the reasons stated above, the ALJ's decision to give Dr. Ginsburg's statements little weight was supported by substantial evidence and should be affirmed.

**E. Use of the Grids**

The ALJ then conducted his Step Five analysis.  The ALJ may apply the Grids or consult a vocational expert ("VE").  See Heckler v. Campbell, 461 U.S. 458, 462 (1983); Rosa v. Callahan,  168 F.3d 72, 78 (2d Cir. 1999); 20 C.F.R. pt. 404, subpt. P, App. 2 (2003).  "For a claimant whose characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether [s]he is disabled."  Pratts v. Chater, 94 F.3d 34, 38-39 (2d Cir. 1996).  However, "where the claimant's work capacity is significantly diminished beyond that caused by his [or her] exertional impairment, the application of the grids is inappropriate," as the Grids do not take into account nonexertional impairments.  Bapp v. Bowen, 802 F.2d 601, 605-06 (2d Cir. 1986) (citations omitted).  In this case, Crowe contends that using the Grids was inappropriate and a vocational expert needed to be called regarding the effect of her nonexertional limitations, particularly her fatigue.

The ALJ concluded that, even with nonexertional impairments, Crowe "has the

33

residual functional capacity to perform the full range of light work . . . [as s]he maintains

the ability to meet the basic mental demands of competitive, remunerative, unskilled

work, as set forth in SSR 85-15." T. 19.

> Light work involves lifting no more than [twenty] pounds at a
> time with frequent lifting or carrying of objects weighing up to
> [ten] pounds.  Even though the weight lifted may be very
> little, a job is in this category when it requires a good deal of
> walking . . . or when it involves sitting most of the time with
> some pushing and pulling of arm or leg controls . . . If
> someone can do light work, . . . he or she can also do
> sedentary work, unless there are additional limiting factors
> such as a loss of fine dexterity or inability to sit for long
> periods of time.

20 C.F.R. § 404.1567(b).  Additionally, unskilled work is defined as:

> The basic mental demands of competitive, remunerative,
> unskilled work include the abilities (on a sustained basis) to
> understand, carry out, and remember simple instructions; to
> respond appropriately to supervision, coworkers, and usual
> work situations; and to deal with changes in a routine work
> setting. A substantial loss of ability to meet any of these basic
> work-related activities would severely limit the potential
> occupational base. This, in turn, would justify a finding of
> disability because even favorable age, education, or work
> experience will not offset such a severely limited occupational
> base.

SSR 85-15, at *4.

Consulting examiners and the disability analyst all agreed, and the ALJ adopted

the physical RFC, that Crowe had mild limitations waking, mild to moderate limitations

in climbing stairs, and moderate limitations lifting and carrying things.  T. 16, 129 (same

assessment, completed by Dr. Naughten); see also T. 247 (Dr. Ginsburg's assessment

that Crowe was moderately limited in her ability to walk, stand and use stairs, but

unrestricted in her abilities to sit, lift, carry, push, pull, communicate, etc.).  The disability

analyst indicated that Crowe could occasionally lift and carry twenty pounds, frequently

lift and carry ten pounds, stand or walk for six hours a day, and sit for six hours a day.

T. 147.  The only opinion that did not support these limitations was Dr. Ginsburg's,

which was properly discredited for the reasons stated above.[4]

Additionally, the ALJ did account for Crowe's potential problems dealing with a

stressful environment by identifying her mild to moderate limitations "performing

complex tasks independently, relating adequately with others, and appropriately dealing

with stress," and acknowledging that she requires "a simple job in which she does not

have to work closely with other people," and concluding that unskilled work was

appropriate for her  T. 17.  The limitations stated above do not constitute a significant

diminishment of Crowe's capacities so that her nonexertional impairments precluded

the ALJ from using the Grids.  Crowe's mental RFC details that she is fully able to

understand, carry out, and remember simple instructions and that she only suffers from

mild to moderate difficulties with responding appropriately to supervisors and coworkers

and dealing with changes in a routine.  As Crowe has not suffered a substantial loss in

her ability to interact with other or deal with workplace stress, unskilled work as defined

by the Grids was an appropriate conclusion.  See Berrardo v. Astrue, No. 08-CV-642,

2010 WL 3604149, at *5-6 (N.D.N.Y. May 26, 2010) (affirming ALJ's decision that

claimant could perform unskilled labor in spite of her major depressive and anxiety

disorder which caused her difficulties maintaining a regular schedule and making

---

[4] Dr. Ginsburg's physical RFC also states that Crowe's medical conditions did not impact her ability to sit.  T. 239-40.  While not relied upon, this also supports a light work occupation that primarily encompasses sitting, and also qualifies Crowe for sedentary work.  20 C.F.R. § 404.1567(b)

appropriate decisions because the medical evidence did not establish that claimant was unable to perform this functions and the overall evidence indicated nothing more than "mild to moderate difficulties," which supported a conclusion of unskilled work).

Accordingly, the Commissioner's findings in this regard should also be affirmed.

## VI. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that the Commissioner's decision denying disability benefits be **AFFIRMED**.

Pursuant to 28 U.S.C. §636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. §636(b)(1); Fed R. Civ. P. 72, 6(a), 6(e).

DATED:   August 2, 2011
             Albany, New York

United States Magistrate Judge